NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0474n.06

No. 10-1231

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jul 12, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DOMINICK J. VINCENTINI, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES TAX COURT |
| COMMISSIONER OF INTERNAL REVENUE, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |
| | ) | |

Before: ROGERS and KETHLEDGE, Circuit Judges; RUSSELL, Chief District Judge.[*]

RUSSELL, Chief District Judge. Petitioner-Appellant Dominick J. Vincentini ("Vincentini") appeals a final decision issued by the Tax Court which upheld the Internal Revenue Service's ("IRS") disallowance of a theft-loss deduction that Vincentini had claimed he could carry back to 1999, and its decision to impose an accuracy-related penalty under 26 U.S.C. § 6662 for the mistakes he made on that year's return. This Court affirms the Tax Court's decision.

**I. BACKGROUND**

Beginning sometime in 1997, Vincentini began listening to a series of financial and investment audiocassette tapes entitled "Gateway to Financial Freedom" created by Keith Anderson.

---

[*]The Honorable Thomas B. Russell, United States Chief District Judge for the Western District of Kentucky, sitting by designation.

Through the tapes, Vincentini learned about an organization created by Anderson known as Anderson Ark & Associates ("AAA"). AAA marketed itself as an investment company with offices in the United States and Costa Rica. Listening to the tapes motivated Vincentini to attend two international conferences where the investment opportunities offered by AAA were pitched to potential investors.

In 1999, following the conferences, Vincentini decided to invest in two of AAA's programs: the Loan Four Program and the Look Back Program. Regarding the former, it was marketed as an investment in factoring commissions for high-end consumer goods. Vincentini claims that he was promised annualized returns of 30 to 50 percent. All told, he invested $800,000.00 in the Loan Four Program. With the Look Back Program, Vincentini created the joint venture Birdlane Marketing Venture ("Birdlane") with AAA, which would allow him to capitalize on an investment-loss deduction. AAA indicated to investors that the partnership would use the proceeds from a business loan to underwrite the marketing of books, electronic media, and audio tapes. On behalf of Birdlane, Vincentini executed a promissory note for $950,000.00 from La Maquina Blanca, S.A., a purported Costa Rican corporation. To effectuate the loan, Vincentini was required to pay some $76,000.00 in origination fees, while the majority of the loan was paid to Macro Media Advertising LLC, an entity operated by AAA. This transaction generated a net operating loss for Birdlane in 1999, which, in turn was passed on to Vincentini. In reality, however, the loans affiliated with the Look Back Program were illusory; AAA simply used the fake loans to generate and then steal from investors the "fees" needed to obtain the fictional capital.

To aid Vincentini in the Look Back Program, AAA officials referred him to Gary Kuzel. Representing himself as a Certified Public Accountant, Kuzel drew up the legal documents for Birdlane, explained the partnership framework to Vincentini, and provided him with a number of documents relevant to his investment. Kuzel also prepared Vincentini's 1999 Form 1040, on which he claimed Birdlane's apparent partnership loss of $907,470.00, which offset a $796,629 early distribution from Vincentini's IRA. Despite his substantial investments in these programs, Vincentini claimed at trial that the profits he was promised failed to materialize.

On February 28, 2001, law enforcement officials from the United States and Costa Rica raided AAA's offices on the suspicion that the investment programs were in fact elaborate Ponzi schemes. Four of the principals for AAA, Keith Anderson, Wayne Anderson, Richard Marks, and Karolyn Grosnickle, were arrested and indicted. By 2002, a number of them had been convicted on federal criminal charges in the United States District Court for the Eastern District of California. *See United States v. Anderson*, 391 F.3d 970 (9th Cir. 2004). That same year, these criminal defendants, along with two other AAA employees (collectively "AAA Defendants"), were also indicted on a variety of federal criminal charges in the district court for the Western District of Washington. This case ended in convictions as well in 2004. The Washington district court ordered the AAA Defendants to pay restitution to their victims and to forfeit a substantial amount of personal and real property, proceeds from their ill-gotten gains.

Vincentini says that he learned of the raids on AAA's offices over the radio a few days after they occurred. In the months following, as the fraudulent scheme unraveled in the courts, he claims that he and other investors spoke with representatives from AAA, including Keith Anderson, on

prescheduled teleconferences. The representatives worked to assuage the obvious concerns of Vincentini, telling him that his investment was safe and that the federal investigation was only a temporary setback. By May of 2001, AAA's conferences had stopped and Vincentini was actively trying to withdraw his investment from the Loan Four Program. There were also phone conferences between the investors and Costa Rican attorneys exploring whether to begin legal proceedings against the principals of AAA. Although Vincentini states that he participated in at least one of these conferences, he ultimately chose not to retain legal counsel to pursue his money because he thought such efforts to be in vain. Vincentini further says he tried, unsuccessfully, to withdraw his investment from AAA by submitting several "directives" to Kuzel and other principals requesting the release of his funds.

On March 6, 2003, the IRS sent a statutory notice of deficiency to Vincentini stating that the partnership-loss deduction he took in 1999 for Birdlane was inappropriate. The notice also assessed against him an accuracy-related penalty under 26 U.S.C. § 6662 for the errors in his return. Vincentini initially filed a petition with the Tax Court objecting to this determination, but he eventually conceded that the deduction was improper, as the AAA Defendants had revealed during their trials that the loans for the Look Back Program had never existed. On April 13, 2003, during the pendency of the matter before the Tax Court, Vincentini filed an amended return for 1999 on Form 1040X. There, Vincentini claimed a theft-loss deduction of $835,000.00 (purportedly carried back from 2001 or 2002); this figure however was eventually adjusted downward to $511,500.00.

On May 23, 2007, a trial was held by the Tax Court to consider the new theft-loss argument and the penalty imposed under section 6662. After considering the evidence before it, the Tax Court

concluded that Vincentini had not met his burden of proof in showing that there was no reasonable prospect of recovery for his theft loss from the AAA Defendants. Specifically, the Tax Court's opinion set out the following basis for this conclusion:

> The only evidence offered by petitioner regarding his analysis of his prospect of recovery in 2001 was petitioner's uncorroborated testimony that he made some attempts to recover his money. Petitioner did not offer in evidence the forms that he supposedly filled out and submitted to [AAA]. Petitioner did not call as a witness at trial anyone who could testify as to his participation in the conference calls or any other attempts to recover his money. More importantly, petitioner did not testify that he believed at the end of 2001 that he had no reasonable prospect of recovering his money.

*Vincentini v. Comm'r*, 96 T.C.M. (CCH) 400, No. 7166–03, 2008 WL 5137345, at *8 (T.C. Dec. 8, 2008). The Tax Court also upheld the penalty under section 6662, finding that since Vincentini knew of Kuzel's affiliation with AAA, any reliance upon him was misplaced and unreasonable. *Id*. at *10. Although Vincentini reasserted his objections in a motion to reconsider, the Tax Court rejected his new arguments as well. *See Vincentini v. Comm'r*, 98 T.C.M. (CCH) 427, No. 7166–03, 2009 WL 3739461 (T.C. Nov. 9, 2009). This appeal has followed.

## II. ANALYSIS

### A. Standard of Review

The statute that grants this Court the jurisdiction to hear appeals from the Tax Court also provides that the review of these decisions shall be in the "same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). Therefore, the Tax Court's findings of fact are reviewed under the clearly erroneous standard, *Kearns v. Comm'r*, 979 F.2d 1176, 1178 (6th Cir. 1992), and the Tax Court's application of law is

subject to *de novo* review. *Id.* Factual issues include whether a taxpayers has a reasonable prospect

of recovery of a loss. Treas. Reg. § 1.165-1(d)(2)(i). Penalties under section 6662 for a substantial

understatement of income taxes are reviewed *de novo* by this Court, while the factual foundation for

the understatement is reviewed for clear error. *Estate of Kluener v. Comm'r*, 154 F.3d 630, 637 (6th

Cir. 1998). "[F]actual determinations are not clearly erroneous unless [this Court is] left with a

definite and firm conviction that a mistake has been made." *Kearns*, 979 F.2d at 1178.

### B. Theft-Loss Deduction

The tax code provides a deduction for losses that are "sustained during the taxable year and

not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). Individuals attempting to

claim such a deduction are restricted to losses incurred while operating a trade or business, losses

arising from profit-seeking transactions, and, subject to certain limitations, property losses caused

by fire, storm, shipwreck, or theft. *Id.* § 165(c)(1)-(3). Theft losses qualify as net operating losses

and may be carried back up to three taxable years. *Id.* § 172(a), (b)(1)(F)(ii)(I).

The genesis for the theft-loss analysis is the taxable year in which the taxpayer discovered

the loss. *Id.* § 165(e). It is the taxpayer's burden to show that the loss was suffered and in what year

it occurred. *Boehm v. Comm'r*, 326 U.S. 287, 294 (1945); *Ginsberg v. Comm'r*, 4 F.3d 993, at * 4

(6th Cir. 1993) (table). Speculation and conjecture will not support a taxpayer deduction under this

provision; instead "a loss must be evidenced by closed and completed transactions, fixed by

identifiable events." Treas. Reg. § 1.165-1(b) (as amended in 1977). In describing the year a

taxpayer may claim a loss deduction, treasury regulations provide instructions on the impact of

recovering that loss:

> If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances.

*Id*. § 1.165-1(d)(2)(i). This reasonable-prospect requirement directly impacts theft losses and when such a deduction may be taken by a taxpayer. *See id*. § 1.165-1(d)(3).

Both parties concede that Vincentini discovered by 2001 that he had been the victim of AAA's fraudulent scheme. Given the three-year carry-back provision, the only remaining query is whether the Tax Court clearly erred in determining that Vincentini failed to demonstrate with reasonable certainty that there was no reasonably prospect of recovery in 2001 or 2002. "A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor." *Ramsay Scarlett & Co. v. Comm'r*, 61 T.C. 795, 811 (1974) (citations omitted) *aff'd* 521 F.2d 786 (4th Cir. 1975); *see Jeppsen v. Comm'r*, 128 F.3d 1410, 1418 (10th Cir. 1997); *Miller v. Comm'r*, 733 F.2d 399, 407 (6th Cir. 1984) (Contie, J. dissenting). This is an objective standard, where the Court must examine a taxpayer's reasonable expectations at the close of the taxable year in which the deduction was claimed. *Ramsay Scarlett & Co.*, 61 T.C. at 811. Taxpayers need not refrain from taking a loss deduction simply because there exists a remote or nebulous possibility of recovery. *See United States v. S.S. White Dental Mfg. Co. of Pa.*, 274 U.S. 398, 402-03 (1927) (the tax code does "not require the taxpayer to be an incorrigible optimist"); *Rudiger v. Comm'r*, 22

B.T.A. 204, 206 (1931) (taxpayer does not have to postpone a loss deduction when there is only a "bare hope" of recoupment); *see also*, 7 J. Mertens, Law of Federal Income Taxation § 28:33 (2011). Still, in a year where the prospect of recovery is simply unknowable, a theft-loss deduction under section 165 is inappropriate. *Jeppsen*, 128 F.3d at 1418.

In examining the objective evidence, the Tax Court could properly conclude that Vincentini did not meet his burden. At trial he declined to offer anything more than his own testimony to show that at the end of 2002 there was no reasonable prospect of recovery. Even though Vincentini testified that he had both sent written requests to officials from AAA demanding the return of his money and participated in conference calls with Costa Rican attorneys, such statements were uncorroborated and self serving. That Vincentini did not say that he subjectively believed that there was no reasonable prospect of recovery further supports the Tax Court's ultimate conclusion. The Tax Court also found that portions of Vincentini's testimony were not credible. This Court has "long given considerable deference to the Tax Court's . . . first-hand assessment of the credibility of witnesses before them." *Kosinski v. Comm'r*, 541 F.3d 671, 680 (6th Cir. 2008) (citations omitted). Vincentini has not provided good reason to revisit this determination. With a scarce and unreliable evidentiary foundation, a review of the Tax Court's decision does not give way to a "definite and firm conviction that a mistake has been made." *Kearns*, 979 F.2d at 1178.

On appeal, Vincentini insists that the Tax Court overlooked two important facts that were properly before it when it made its decision: that by 2002 convictions against the AAA Defendants had been handed down by the district court in California and that during this criminal trial they were represented by court-appointed counsel pursuant to 18 U.S.C. § 3006A. Vincentini avers that these

two pieces of evidence conclusively demonstrate that there was no reasonable prospect for recovery as they indicate that the AAA Defendants were facing substantial terms of imprisonment and could not afford attorneys. Although this evidence is somewhat supportive of Vincentini's position, it does not persuade this Court that the Tax Court's decision was clearly erroneous. Notwithstanding the convictions, in 2002 the trial courts in California and Washington had not decided whether the AAA Defendants would be subject to property forfeitures or restitution orders. Recovery from these parties could have been obtained through these avenues or through the civil suit already contemplated by some investors. Therefore, the impact of the convictions was altogether unclear to Vincentini in 2002. Regarding the use of court-appointed counsel for the criminal trial, Vincentini declined to investigate the AAA Defendants' solvency prior to his own trial and thus there was no evidence on the issue presented to the Tax Court prior to its decision. While the use of court-appointed counsel is probative of whether the AAA Defendants could satisfy a judgment against them, this Court agrees with the Tax Court's implicit finding that it is not dispositive.

The Tax Court carefully confronted Vincentini's arguments and concluded that the evidentiary gaps at trial were too great for him to meet his burden of persuasion. This Court is in no better position to find otherwise.

### C. Accuracy-Related Penalty

The Tax Court also upheld the IRS's decision that Vincentini was liable for an accuracy-related penalty under section 6662. The tax code levies a 20 percent penalty for a "substantial understatement" of a taxpayer's income tax liability. 26 U.S.C. § 6662(a), (b)(2). This takes place "for any taxable year if the amount of the understatement for the taxable year exceeds the greater of

10 percent of the tax required to be shown on the return for the taxable year, or $5,000." *Id*. § 6662(d)(1)(A) (formatting altered). "The term understatement means the excess of the amount of the tax required to be shown on the return for the taxable year, over the amount of the tax imposed which is shown on the return." *Id*. § 6662(d)(2)(A) (formatting altered). The factual findings underlying a penalty are reviewed for clear error. *Estate of Kluener*, 154 F.3d at 637.

The tax code also provides taxpayers a defense to penalties under section 6662. It says that "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1). "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." *Mortensen v. Comm'r*, 440 F.3d 375, 387 (6th Cir. 2006) (quoting Treas. Reg. § 1.6664-4(b)(1)). Good faith reliance on a tax professional will negate a taxpayer's liability for penalties under section 6662. *United States v. Boyle*, 469 U.S. 241, 250-51 (1985). Taxpayers may not, however, blindly accept the advice of just any tax professional; only reasonable reliance on "a competent and independent advisor unburdened with a conflict of interest" will insulate them from section 6662's provisions. *Mortensen*, 440 F.3d at 387.

Vincentini does not contest that there was a substantial understatement of his tax liability on the 1999 return. Rather, he appeals the Tax Court's rejection of his argument that he relied in good faith on Kuzel's advice. On review, the Tax Court did not clearly err in this finding. Vincentini conducted no research on Kuzel's professional background or the extent of his ties with AAA. Nor did he solicit aid from another financial professional to create the Birdlane partnership or prepare

his taxes for 1999, despite Kuzel's open affiliation with AAA. Claims by Vincentini at trial that he consulted his personal investment advisor were unsubstantiated and therefore properly discarded by the Tax Court. Finally, the imposition of an accuracy penalty under these circumstances is in line with this Court's previous decisions. *See e.g.*, *Mortensen*, 440 F.3d at 387 (a taxpayer's reliance on a promoter of cattle breeding partnerships was insufficient to establish the good faith defense); *Pasternack v. Comm'r*, 990 F.2d 893, 903 (6th Cir. 1993) (investor could not reasonably rely on advice from financial advisors where "the purported experts were either the promoters themselves or agents of the promoters").

Much like *Mortensen* and *Pasternak*, Vincentini put his faith in a biased professional, affiliated with the organization promoting the investments. That he did not question Kuzel about his professional background indicates that Vincentini either errantly omitted important investigatory steps or chose to ignore the telltale signs of an investment that was too good to be true. Either way, he did not act in good faith to determine his tax liability.

### III. CONCLUSION

In closing, the Court must afford the Tax Court broad discretion under the clearly erroneous standard for each of these issues. Judging the evidence presented at trial through this lens, it cannot be said with firm conviction that a mistake has been made. For these reasons, the Tax Court's decision is AFFIRMED.